UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEL MONTE FRESH PRODUCE<br>COMPANY and | ) )<br>) | |
| DEL MONTE FOODS (U.A.E.) FZE, | )<br>) | |
| Plaintiffs, | )<br>) | C.A. No. 1:07-cv-02143 (JDB) |
| vs. | )<br>) | |
| UNITED STATES OF AMERICA, | )<br>) | |
| UNITED STATES DEPARTMENT OF<br>THE TREASURY, and | )<br>) )<br>) | |
| OFFICE OF FOREIGN ASSETS<br>CONTROL, | )<br>) )<br>) | |
| Defendants. | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS (ORAL HEARING REQUESTED)

Daniel G. Jarcho (D.C. Bar No. 391837)
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C.  20006
(202) 496-7500
email: djarcho@mckennalong.com

Myron Paul Barlow (D.C. Bar No. 462886)
BARLOW AND ASSOCIATES, PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.  20015
(202) 895-1714
email: mb@barlowpllc.com

Attorneys for Plaintiffs
Del Monte Fresh Produce Company and
Del Monte Foods (U.A.E.) FZE

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION.................................................................................... 1

II.   REQUEST FOR ORAL HEARING ...................................................... 2

III.  STATEMENT OF FACTS AND PROCEDURAL HISTORY .......................... 2

      A.   The July 2006 License Application........................................ 3

      B.   The October 2006 Lawsuit .................................................... 4

      C.   Additional Delays and OFAC's Announcement That it May Not
           Comply With its Own Deadline ............................................ 5

      D.   The August 2007 License Application .................................. 6

      E.   This Lawsuit .......................................................................... 6

IV.   ARGUMENT ........................................................................................ 8

      A.   The Controversy is "Capable of Repetition, Yet Evading Review"........ 8

           1.   There is a Reasonable Expectation That Del Monte  Will
                be Subject to Licensing Delays in the Future ............................. 8

                a.   The "Action" at Issue is Inaction on Del Monte's
                     Export Licenses ................................................. 8

                b.   There is a Reasonable Expectation That OFAC Will
                     Delay Action on Del Monte's Future Iranian Food
                     Export License Applications............................................ 11

                     (1)   The Facts Currently Known to Del Monte
                           Demonstrate a Reasonable Expectation of
                           Future Delay ........................................................ 11

                     (2)   The Court Should Not Grant the Motion
                           Without Permitting Del Monte to Take
                           Discovery About Likelihood of Recurrence .......... 12

           2.   The Duration of OFAC's Licensing Delays is Too Short to
                be Fully Litigated Before it Ceases............................................ 15

      B.   The Court Should Not Rule on the "Voluntary Cessation"
           Exception Without Permitting Del Monte to Take Discovery
           Regarding the Signing and the Issuance of the 2007 License............. 16

      C.   Del Monte Has Standing to Bring This Suit ....................................... 19

      D.   The Court Should Reject the Government's Request to Deny Del
           Monte a Remedy at the Pleadings Stage of the Case .......................... 22

V.    CONCLUSION................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Armster v. U.S. Dist. Ct., 806 F.2d 1347 (9th Cir. 1986) ........................................... 12

Burlington N. R.R. Co. v. Surface Transp. Bd.,
   75 F.3d 685 (D.C. Cir. 1996)........................................................................ 9, 12, 15

Coal. for Underground Expansion v. Mineta,
   333 F.3d 193 (D.C. Cir. 2003)................................................................................ 13

Doremus v. United States, 793 F. Supp. 942 (D. Idaho 1992) .................................. 17

Friends of the Earth v. Laidlaw Envtl. Services, Inc.,
   528 U.S. 167 (2000) ..................................................................................... 21, 23

Garden State Broad. Ltd. P'ship v. FCC,
   996 F.2d 386 (D.C. Cir. 1993)........................................................................ 20, 21

Herbert v. Nat'l Acad. of Scis., 974 F.2d 192 (D.C. Cir. 1992) .............................. 2, 14

Houston v. Dep't of Hous. and Urban Dev.,
   24 F.3d 1421 (D.C. Cir. 1994)......................................................................... 9, 22

In re Swine Flu Immunization Prod. Liab. Lit.,
   880 F.2d 1439 (D.C. Cir. 1989)............................................................................. 14

Isenbarger v. Farmer, 463 F. Supp. 2d 13 (D.D.C. 2006)......................................... 10

Kitty Hawk AirCargo, Inc. v. Chao, 418 F.3d 453 (5th Cir. 2005) ...................... 19-20

Land v. Dollar, 330 U.S. 731 (1947)........................................................................ 14

Nat'l Black Police Ass'n v. Dist. of Columbia,
   108 F.3d 346 (D.C. Cir. 1997)............................................................................... 10

Natural Res. Def. Council v. E.P.A., 595 F. Supp. 1255 (S.D.N.Y. 1984)................. 17

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004)........................................ 8

People for the Ethical Treatment of Animals, Inc. v. Gittens,
   396 F.3d 416 (D.C. Cir. 2005)............................................................................... 10

Pub. Utilities Comm'n v. F.E.R.C., 236 F.3d 708 (D.C. Cir. 2001) ........................... 15

S.E.C. v. Sloan, 436 U.S. 103 (1978) ............................................................. 9

Spencer v. Kemna, 523 U.S. 1 (1998).................................................. 8, 9, 10, 15

United States Parole Comm'n v. Geraghty,
    445 U.S. 388 (1980) ................................................................. 21

United States v. W.T. Grant Co., 345 U.S. 629 (1953)................................. 17

Urquhart v. American-La France Foamite Corp.,
    144 F.2d 542 (D.C. Cir. 1944)............................................... 13

White v. Lee, 227 F.3d 1214 (9th Cir. 2000)............................................. 20

Wilton v. Seven Falls Co., 515 U.S. 277 (1995) ...................................... 23

**STATUTES**

5 U.S.C. §§ 551(6), (9) .................................................................. 21

5 U.S.C. § 551(13) ........................................................................ 8

5 U.S.C. § 552(a)(2)(i), (ii) ......................................................... 21

5 U.S.C. § 706(1) .................................................................. 1, 2, 4

22 U.S.C. § 7205(a)(1) ............................................................... 15

22 U.S.C. § 7205(b) ..................................................................... 11

28 U.S.C. § 2202........................................................................ 20

**OTHER AUTHORITIES**

31 C.F.R. § 560.530(c)................................................................. 6

66 Fed. Reg. 36,685 (July 12, 2001) ...................................... 5, 6, 12

72 Fed. Reg. 12,981 (March 20, 2007)...................................... 6, 12

Fed. R. Civ. P. 30(b)(6)................................................................ 14

Fed. R. Civ. P. 56(f)..................................................................... 15

I.    **INTRODUCTION**

This case is the second lawsuit in thirteen months that Plaintiff Del Monte
Fresh Produce Company has filed against the Office of Foreign Assets Control
("OFAC"), challenging OFAC's delays in issuing export licenses that authorize food
shipments to Iran.  In both cases, the applicable statute is the Trade Sanctions
Reform and Export Enhancement Act of 2000 ("TSRA"), which mandates an
expedited process for issuing such licenses.  TSRA – which generally prohibits food
embargoes against Iran – requires OFAC to issue a requested food export license
unless the proposed recipient of the food is a terrorist entity.  Del Monte contends
that under the regulatory regime established by TSRA and its implementing
regulations, OFAC can only deny the license on anti-terrorism grounds under two
conditions:  (1) if the proposed recipient of the food is designated as a terrorist entity
on either of two government terrorist lists; or (2) if OFAC refers the license
application to the State Department for anti-terrorism review and the State
Department objects – within nine business days after the referral and within eleven
business days after OFAC initially received the license application – on the ground
that the proposed recipient of the food may promote international terrorism.  See
Am. Compl. ¶¶ 6-15.  If neither of the two conditions applies, TSRA requires OFAC
to issue the license.

In both of its lawsuits, Del Monte has claimed that OFAC unlawfully
withheld or unreasonably delayed issuance of an Iranian food export license,
because these deadlines had long passed, and the government had made no
determination that the license raised any terrorism concerns.  See 5 U.S.C. § 706(1)

(requiring court to "compel agency action unlawfully withheld or unreasonably delayed").  It is significant here that in both of these lawsuits, OFAC issued the disputed license shortly after Del Monte filed the complaint.  After issuing the most recent license, the government now claims that the parties' controversy has ended, and that the Court should dismiss the case, allowing OFAC to go back to its old ways.  But the government's position has no basis in the law.  The law does not condone this kind of cat-and-mouse scenario.  The exceptions to the mootness doctrine raised in the government's motion are designed to address exactly the situation presented here – in which a plaintiff facing recurring injuries from the same defendant files suit, only to have the defendant accede to its central demands before the Court has an opportunity to rule on the legal issues presented.  The pertinent caselaw holds that under these circumstances, the Court has jurisdiction to rule on those issues, based on the facts that existed on the date the suit was filed, because otherwise the plaintiff could never obtain judicial review of the defendant's conduct.  The Court therefore should deny the motion to dismiss.

## II.  <u>REQUEST FOR ORAL HEARING</u>

Pursuant to Local Rule 7(f), Plaintiffs respectfully request an oral hearing on the motion to dismiss.

## III.  <u>STATEMENT OF FACTS AND PROCEDURAL HISTORY</u>

The Court is entitled to look beyond the pleadings to any facts pertinent to the jurisdictional issues presented in the government's motion to dismiss.  <u>See, e.g.,</u> <u>Herbert v. Nat'l Acad. of Scis.</u>, 974 F.2d 192, 197 (D.C. Cir. 1992).  For the Court to resolve those issues, it must consider the probability of repeated inaction and delay

by OFAC.  And to reach a judgment about the probability of repeated inaction and delay, the Court must evaluate the facts concerning OFAC's licensing practices during the period before Del Monte filed this lawsuit.  Our statement of facts and procedural history begin with the license application that led to Del Monte's original lawsuit against OFAC in 2006.

### A.    The July 2006 License Application

On July 31, 2006, Del Monte submitted a license application to OFAC, seeking authorization to ship food to customers in Iran.  The July 2006 application was substantially the same as the later application at issue in the present case, with the only material differences being the particular food products covered and the specific customers for which authorization was requested.  Declaration of Katia Gousset ("Gousset Decl.") ¶¶ 2, 8.

OFAC referred the application to the State Department on August 7, 2006 for anti-terrorism review.  The State Department returned the application without objection on or about September 12, 2006.  Id. ¶¶ 2-3; Declaration of Jeffrey S. Bailey ("Bailey Decl.") ¶ 2; Declaration of Myron Paul Barlow ("Barlow Decl.") ¶ 2. During September and October 2006, Del Monte's representative inquired several times about the status of the application but could obtain no information from OFAC about when the license would be issued.  Gousset Decl. ¶ 3.

On October 20, 2006 – 81 days after the license application was submitted – Del Monte's in-house and outside counsel contacted OFAC by telephone to inquire about the status of the application.  They first spoke with an OFAC licensing official, who could not say when the license would be issued.  The official stated that

the State Department had returned the application without objection, that the license had been written, and all that was required to issue the license was a supervisor's signature. The official then brought a supervisor into the conversation.

The supervisor stated that he could not say when the license would be issued or whether it would be issued at all. He also indicated that he had had the licensing program running smoothly until a higher authority had intervened and delayed the process. In particular, the supervisor stated that "Zeus" was interfering in his "hut" and that as a result his licensing program was now like post-war "Dresden" and "Czechoslovakia." He also stated that nothing was coming out of his "hut" until Del Monte went to "Mount Olympus" to force OFAC to take action on its license. Bailey Decl. ¶ 2; Barlow Decl. ¶ 2.

**B.    The October 2006 Lawsuit**

One week later, Del Monte filed an Administrative Procedure Act ("APA") suit against OFAC, arguing that the agency had unlawfully withheld action on the license, and unreasonably delayed issuing the license, within the meaning of 5 U.S.C. § 706(1). See Del Monte Fresh Produce Company v. United States, C.A. No. 1:06CV01844 (RJL) (filed October 27, 2006). On November 8, 2006, as Del Monte was preparing to file a preliminary injunction motion, OFAC issued the license. See Bailey Decl. ¶ 3. The following day Del Monte dismissed the suit without prejudice.

After dismissal of the suit, Del Monte's outside counsel requested a meeting with OFAC officials in order to have a dialog about whether there was a way to accelerate the licensing process. Barlow Decl. ¶ 3. However, OFAC did not agree to meet or otherwise communicate with Del Monte or its counsel on this subject.

**C.    Additional Delays and OFAC's Announcement
That it May Not Comply With its Own Deadline**

From the time Del Monte dismissed its initial lawsuit in November 2006

through February 2007, Del Monte filed four additional license applications with

OFAC, all of which requested authorization to ship food to Iran.  As explained

above, Del Monte contends that TSRA and its implementing regulations require

OFAC to issue a license within eleven business days after receiving the license

application, and within nine business days after referring the application to the

State Department, as long as the State Department does not object on anti-

terrorism grounds in the meantime.  OFAC failed to comply with either deadline for

any of the four applications, although the delays were shorter than before.  <u>See</u>

Gousset Decl. ¶¶ 4-7.

Then in March 2007, OFAC formally announced, as matter of agency <u>policy</u>,

that it may not be complying with the nine business-day deadline in the future.

When it originally implemented the TSRA licensing scheme, OFAC announced that

it would respect that deadline.  66 Fed. Reg. 36,685 (July 12, 2001) ("If no

government agency raises an objection to or concern with the application within

nine business days from the date of any such referral, OFAC will issue the one-year

license, provided that the request otherwise meets the requirements set forth in this

rule.").  Yet in a Policy Statement published in the March 30, 2007 Federal

Register, OFAC notified the public that its "processing of one-year license requests

may take longer than the time periods suggested at the inception of the TSRA program." 72 Fed. Reg. 12,981 (March 20, 2007).[1]

### D.    The August 2007 License Application

On August 8, 2007, Del Monte submitted the license application that is the subject of this lawsuit.  The license application contained all of the information specified in OFAC's regulations.  See 31 C.F.R. § 560.530(c).  Because the application was complete, OFAC sent it to the State Department for anti-terrorism review on August 17, 2007.  See Gousset Decl. ¶¶ 8-9.

On information and belief, OFAC did not receive an objection or any other response from the State Department within nine business days, which expired on August 30, 2007.  On September 13, 2007 – two weeks after the nine business-day deadline expired – the State Department did respond to OFAC's referral of the license application.  Id. ¶ 10.  On information and belief, the State Department's response did not raise an objection to the license, because otherwise OFAC would have denied the license application at that point.  See 66 Fed. Reg. 36,685 ("If any government agency raises an objection to the request within nine business days from the date of referral, OFAC will deny the request for the one-year license.")

### E.    This Lawsuit

In the weeks and months that followed its submission of the license application, Del Monte made repeated inquiries to the OFAC "help desk," seeking

---

[1]    OFAC's Federal Register notices do not address the eleven business-day deadline, which is imposed through operation of the statute.  See Am. Compl. ¶¶ 12-15.

information about the application's status.  None of these inquiries yielded any information about when (or whether) the license would be issued.  On November 27, 2007 – approximately three months after the deadlines described above had expired – Del Monte's representative again called the OFAC "help desk" to inquire about the status of the application; the "help desk" stated that the application was still pending.  Gousset Decl. ¶ 11.

The following morning, on November 28, 2007, Del Monte filed this action and served the summons and complaint by hand on the U.S. Attorney's Office.  At approximately noon the same day, Del Monte's counsel called the U.S. Attorney's Office and informed the Assistant U.S. Attorney assigned that the case had been filed and served, and that a preliminary injunction motion would be filed in the very near future.  OFAC did not issue the license on November 28.

On November 29, 2007, Del Monte filed and served its preliminary injunction motion.  Later the same day, the Court scheduled a status conference on the preliminary injunction motion for the following day.  Still later on November 29, at 5:30 p.m., OFAC issued the license.  See Exs. B and C to Ex. 1 to Defs.' Mot. to Dismiss.  Del Monte withdrew its preliminary injunction motion the following day.

On December 18, 2007, Del Monte's counsel contacted government counsel to request a meeting with OFAC to discuss the possibility of resolving the parties' dispute over agency delay.  On January 8, 2008, OFAC refused the meeting.  The government's motion to dismiss followed.

IV.    **ARGUMENT**

   A.    **The Controversy is "Capable of
         Repetition, Yet Evading Review"**

This case fits squarely within the exception to the mootness doctrine for

controversies that are "capable of repetition, yet evading review." That exception

applies if "(1) the challenged action is in its duration too short to be fully litigated

prior to cessation or expiration, and (2) there is a reasonable expectation that the

same complaining party will be subject to the same action again." Spencer v.

Kemna, 523 U.S. 1, 17 (1998). Both conditions exist in this case.

      1.    **There is a Reasonable Expectation That Del Monte
            Will be Subject to Licensing Delays in the Future**

         a.    **The "Action" at Issue is
               Inaction on Del Monte's Export Licenses**

As an initial matter, the Court should conclude that the type of "action" at

issue – which the Court must examine for the probability of recurrence – is OFAC's

inaction on Del Monte's Iranian food export licenses. It is well settled that the

Court's authority to review agency actions under the APA covers agency inaction.

The APA expressly includes "failure to act" within the statutory definition of

"agency action" that is subject to judicial review. 5 U.S.C. § 551(13); Norton v. S.

Utah Wilderness Alliance, 542 U.S. 55, 61-62 (2004). Accordingly, the specific

question before the Court is whether OFAC's inaction (i.e., illegal delay) regarding

the August 2007 license application is reasonably likely to recur, when Del Monte

submits future applications for other Iranian food export licenses.

The government argues that the Court should examine whether the <u>specific</u> inaction regarding the August 2007 application <u>itself</u> is likely to happen again, instead of examining whether the same <u>type</u> of agency inaction is likely to recur with respect to future license applications.  Defs.' Mot. to Dismiss at 7.  The government derives this argument from an unduly cramped and literalistic interpretation of caselaw stating that for a controversy to be "capable of repetition," the same complaining party must be "subject to the same action again."  <u>Spencer</u>, 523 U.S. at 17.  The government's interpretation simply cannot be what the doctrine means when it refers to "the same action."  If that were the law, the "capable of repetition" doctrine would never apply in a case challenging a single agency action, because a single action, by definition, can never happen twice.  Yet the D.C. Circuit has held that the "capable of repetition" doctrine is properly applied in suits such as this one, in which the plaintiff challenges a single agency action, seeking a "declaratory judgment that the specific action was unlawful."  <u>Houston v. Dep't of Hous. and Urban Dev.</u>, 24 F.3d 1421, 1429 (D.C. Cir. 1994).

It therefore should come as no surprise that both the Supreme Court and the D.C. Circuit have held that a controversy is capable of repetition if the same <u>type</u> of agency action is reasonably expected to recur.  <u>See, e.g.</u>, <u>S.E.C. v. Sloan</u>, 436 U.S. 103, 109-10 (1978) (controversy capable of repetition where S.E.C. suspension orders ceased after the lawsuit was filed, but there was a reasonable expectation that plaintiff would "suffer the same type of injury" through future suspension orders); <u>Burlington N. R.R. Co. v. Surface Transp. Bd.</u>, 75 F.3d 685, 689 (D.C. Cir.

1996) (controversy capable of repetition where agency took adverse action with respect to one of petitioner's contracts and petitioner had nearly 50 other similarly situated contracts carrying "the potential for a repeat of" the same type of adverse agency action). The cases that the government cites do not hold otherwise and similarly focus on the question whether the same <u>type</u> of dispute is reasonably likely to recur.[2]

Accordingly, the question before the Court is whether there is a reasonable expectation that OFAC will delay action in the future on the same type of license application that Del Monte submitted to OFAC in August 2007. The answer is yes.

---

[2]    See <u>Spencer</u>, 523 U.S. at 17-18 (controversy involving revocation of parole not capable of repetition, because prisoner has not "demonstrated a reasonable likelihood that he will once again be paroled and have that parole revoked"); <u>People for the Ethical Treatment of Animals, Inc. v. Gittens</u>, 396 F.3d 416, 424 (D.C. Cir. 2005) (controversy involving unique public art display not capable of repetition, because the court would need to "imagine a sequence of coincidences too long to credit" in order to "conclude that a dispute like this would arise in the future"); <u>Nat'l Black Police Ass'n v. Dist. of Columbia</u>, 108 F.3d 346, 350 (D.C. Cir. 1997) (controversy involving unique campaign finance law not capable of repetition, because original law was superseded and "contribution limits akin to those" in original law were not likely to be adopted in the future); <u>Isenbarger v. Farmer</u>, 463 F. Supp. 2d 13, 24 (D.D.C. 2006) (controversy involving Army's extension of plaintiff's active duty service obligation not capable of repetition, because there was no reasonable expectation that the Army would again extend his obligation "based on another allegedly unlawful application of" Defense Department directive).

**b.    There is a Reasonable Expectation
That OFAC Will Delay Action on Del Monte's
<u>Future Iranian Food Export License Applications</u>**

**(1)    The Facts Currently Known
to Del Monte Demonstrate a
<u>Reasonable Expectation of Future Delay</u>**

The facts currently known to Del Monte plainly demonstrate a reasonable expectation that OFAC will violate the nine and eleven business-day deadlines described above when Del Monte submits future Iranian food export license applications.

<u>First</u>, OFAC's past delays are a presage of future delays.  Over the past year and a half, OFAC has violated the deadlines <u>every</u> <u>time</u> Del Monte submitted a license application.  <u>See</u> <u>supra</u> at 3-6.   Del Monte will definitely apply for OFAC licenses in the future, on a continuing basis, because selling food products to Iran is, and has been, a part of Del Monte's ongoing business plan.  Bailey Decl. ¶ 4.  Del Monte's recent experience with the licensing process convincingly demonstrates far more than a "reasonable expectation" that OFAC will violate the deadlines with respect to these future licenses.[3]

---

[3]    OFAC's publicly available aggregate data from the same period further support a reasonable expectation of delay.  In its quarterly reports of licensing activities, OFAC indicates that the average processing times for issuing TSRA licenses was 44.7 business days for the period from July to September 2006; 69.9 business days for the period from October to December 2006; and 75.9 business days for the period from January to March 2007.  <u>See</u> Ex. 1.  (OFAC has not issued reports covering later time periods.)  OFAC issued all of these reports after Del Monte filed the original complaint in this case, which included a claim that the agency was violating a statutory requirement to report its licensing delays publicly on a quarterly basis.  <u>See</u> 22 U.S.C. § 7205(b) (requiring reports to Congress on "a

*(Footnote cont'd on next page.)*

Second, OFAC has formally announced, as a matter of agency policy, that it may violate the deadlines in the future. See supra at 5; 72 Fed. Reg. 12,981 (Policy Statement indicating that it "may take longer than" than previously announced deadlines); 66 Fed. Reg. 36,685 (announcing nine business-day deadline). There can be no reasonable expectation that OFAC will respect the deadlines where, as here, agency policy is that it may well not. Cf. Burlington N. R.R. Co., 75 F.3d at 689 (agency's unchanged legal interpretation contributed to conclusion that controversy was "capable of repetition").

Finally, OFAC has refused to engage in any dialog whatsoever with Del Monte about whether or how future delays can be avoided. See supra at 4, 7. The agency's recalcitrance further supports the conclusion that there is a reasonable expectation of future delay. Cf. Armster v. U.S. Dist. Ct., 806 F.2d 1347, 1359 (9th Cir. 1986) (likelihood of recurrence of challenged activity is more substantial if there is no recognition of the initial illegality of the conduct).

> **(2)    The Court Should
> Not Grant the Motion Without
> Permitting Del Monte to Take
> Discovery About Likelihood of Recurrence**

Del Monte respectfully submits that the facts described above are more than sufficient to demonstrate a reasonable expectation Del Monte will be subject to

_____

*(Footnote cont'd from previous page.)*

quarterly basis" describing licensing activities "during the preceding calendar quarter").

illegal delays again in the future.  But if the Court were to disagree, it should permit Del Monte to take discovery on the issue before granting the motion to dismiss.

It is well settled that where, as here, a defendant moves for dismissal on jurisdictional grounds, the plaintiff ordinarily should be permitted to conduct discovery of jurisdictional facts necessary to defend against the motion.  See, e.g., Urquhart v. American-La France Foamite Corp., 144 F.2d 542, 544 (D.C. Cir. 1944) (reversing district court jurisdictional dismissal based on affidavits because district court denied discovery of jurisdictional facts).[4]  In this case, the Court should not grant the motion without authorizing discovery in three areas.

First, the Court should authorize discovery relevant to the reasons OFAC delayed action on the August 2007 license application, as well as the reasons OFAC violated the nine and eleven business-day deadlines when considering the five earlier Del Monte applications described above.  See supra at 11-12.  Such discovery pertains directly to the likelihood that violations will recur.  Furthermore, in order for the discovery to be sufficient, it should include both document requests and a

---

[4]    Although discovery relating to the merits of APA cases is often restricted or unavailable, that is because adjudication of the merits is ordinarily limited to the administrative record.  Here Del Monte seeks discovery as to jurisdictional facts, and the Court's jurisdictional analysis is not similarly limited.  Discovery is appropriate in an APA case (as in any other case) where, as here, the plaintiff seeks to probe factual issues which, if substantiated, would prove jurisdiction.  Cf. Coal. for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (discovery on jurisdictional question considered by Court in APA case but denied because plaintiff made no allegation which, if substantiated, would prove jurisdiction).

deposition of OFAC under Rule 30(b)(6).  See Fed. R. Civ. P. 30(b)(6) (authorizing deposition of governmental agency).

Second, the Court also should authorize a deposition of the licensing official who stated to Del Monte's counsel that supervisory interference (from "Zeus") had caused delay and left the OFAC licensing program in a shambles comparable to post-war "Dresden" and "Czechoslovakia."  See supra at 3-4.  At best, the comments of this official indicate that bureaucratic red tape is very likely to cause recurrent delays for future applications.  At worst, the comments of this official raise the troubling possibility that OFAC could be delaying licensing determinations for reasons unrelated to their merits.  Del Monte should be permitted to find facts on these issues through a deposition of the official who raised the concern.

Third, the Court should authorize documentary and deposition discovery as to any of the facts, set forth at pages 11-12 above, that the government disputes in its Reply Brief.  Any disputes over such facts are material to the question whether the licensing delays are reasonably likely to recur.[5]

---

[5]    The government is correct that there are three ways the court may dispose of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction: 1) consider the complaint standing alone; 2) consider the complaint supplemented by undisputed facts outside the complaint; or 3) consider the complaint supplemented by undisputed facts as well as the court's resolution of disputed facts.  See Herbert, 974 F.2d at 197; see also Land v. Dollar, 330 U.S. 731, 735 (1947).  The first procedure does not apply, because the government does not challenge the sufficiency of the complaint (nor could it, because Del Monte has pleaded the facts necessary to demonstrate the case is not moot).  See Am. Compl. ¶¶ 31-33.  And the Court should authorize discovery regardless of whether it follows the second or third procedure.  The second procedure involves application of a standard similar to the Rule 56 summary judgment standard.   See Herbert, 974 F.2d at 198 n.6 (discussing In re

*(Footnote cont'd on next page.)*

**2.    The Duration of OFAC's Licensing
Delays is Too Short to be Fully Litigated Before it Ceases**

The Court also should hold that the "inaction" at issue – namely OFAC's licensing delay – is "in its duration too short to be fully litigated prior to cessation." Spencer, 523 U.S. at 17.

The D.C. Circuit has held that agency actions of less than two years' duration cannot be "fully litigated" prior to cessation or expiration, so long as the short duration is typical of the challenged action. See Burlington N. R.R. Co., 75 F.3d at 690; Pub. Utilities Comm'n v. F.E.R.C., 236 F.3d 708, 714 (D.C. Cir. 2001). The government does not even attempt to allege that Del Monte has failed to meet this condition, and for good reason. The most significant licensing delay Del Monte has faced is that relating to the August 2007 license, which took the agency 111 days to issue. As egregious as this delay was – more than three months beyond the nine and eleven business-day deadlines – it falls well short of a two-year period. And there is a statutory basis for believing that OFAC is likely never to exceed a two-year period in reviewing a license. TSRA requires that the licenses at issue only have a one-year term. 22 U.S.C. § 7205(a)(1). It would turn the statutory scheme on its head if the agency took even one year to review a license application; if that

---

*(Footnote cont'd from previous page.)*

Swine Flu Immunization Prod. Liab. Lit., 880 F.2d 1439, 1442-43 (D.C. Cir. 1989)). Under that standard, discovery would be warranted for Del Monte to defend against the motion. See Fed. R. Civ. P. 56(f). Application of the third procedure also plainly would justify discovery, to permit a full examination of disputed facts.

were the case, exporters would be forced to apply for a renewal as soon as they received their original license, in order to avoid gaps of time between the expiration of the original license and issuance of the renewal license.

The facts of this case are precisely what the "capable of repetition" doctrine was designed to address – actions of less than two years in which the challenged action ceases after the suit was filed, before it can be fully litigated.  Under these circumstances, the Court has jurisdiction to hear the case and rule on the merits, because otherwise the plaintiff would never be able to obtain judicial review of the defendant's actions.

**B.    The Court Should Not Rule on the "Voluntary Cessation" Exception Without Permitting Del Monte to Take Discovery <u>Regarding the Signing and the Issuance of the 2007 License</u>**

Because the "capable of repetition" exception to the mootness doctrine applies, the Court need not consider whether this case also fits within the second mootness exception raised by the government:  the "voluntary cessation" doctrine. However, assuming <u>arguendo</u> that the Court were to accept the government's arguments on the "capable of repetition" exception, it should allow Del Monte to take discovery before making a ruling under the "voluntary cessation" doctrine.

The government's motion properly raises the possibility that the "voluntary cessation" doctrine applies, given that the inaction challenged in this lawsuit ceased the day after Del Monte filed the complaint, when OFAC issued the license.  Under the "voluntary cessation" doctrine, it is well established that a defendant cannot moot a case merely by refraining from the challenged conduct after the plaintiff files suit:

> [V]oluntary cessation of allegedly illegal conduct does not
> deprive the tribunal of power to hear and determine the
> case, i.e., does not make the case moot.  A controversy
> may remain to be settled in such circumstances, e.g., a
> dispute over the legality of the challenged practices.  The
> defendant is free to return to his old ways.  This, together
> with a public interest in having the legality of the
> practices settled, militates against a mootness conclusion.

United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953) (internal citations

omitted).

However, the government is plainly wrong in suggesting that the doctrine

should not be applied simply because the defendant is a federal agency.  See Defs.'

Mot. to Dismiss at 7.  The government acknowledges that the single case it cites did

not even reach the issue, and other courts have not hesitated to apply the doctrine

in federal agency cases.  In such cases, courts have noted that the government not

only has the burden of proof, but a "heavy burden," to prove that the case is moot

because the "voluntary cessation" doctrine does not apply.  See, e.g., Doremus v.

United States, 793 F. Supp. 942, 946 (D. Idaho 1992) (application of "heavy burden"

is "especially true when an agency claims that the case has become moot due to

subsequent actions taken by the agency itself"); see also Natural Res. Def. Council

v. E.P.A., 595 F. Supp. 1255, 1263 (S.D.N.Y. 1984) (internal citations omitted)

("Courts are understandably reluctant to permit agencies to avoid judicial review,

whenever they choose, simply by withdrawing the challenged rule.")

The government has not met that substantial burden in the materials

submitted with its motion to dismiss.  The government properly notes that a

relevant question under the "voluntary cessation" doctrine is whether the

challenged conduct terminated for reasons related to the litigation.  However, the current evidentiary record relating to that issue is incomplete.  As a result, the Court should not make a ruling under the "voluntary cessation" exception without first allowing Del Monte to take discovery.  See supra at 13 (describing authority to conduct discovery on jurisdictional facts).  This discovery should include document requests, a Rule 30(b)(6) deposition of OFAC, and a deposition of Elizabeth Farrow, the government's declarant regarding the events surrounding the signing and issuance of the 2007 license.

The evidentiary record is incomplete, among other things, because Del Monte has not had the opportunity to probe the facts about why – in a licensing regime with nine and eleven business-day deadlines –  six days passed between the date OFAC claims it signed the license and the date OFAC issued the license.  The government has provided a terse statement on the issue in the declaration accompanying its memorandum.  But Del Monte should be permitted to test that statement by conducting discovery on the issue before the Court rules on "voluntary cessation."  Among other things, Del Monte should be able to inquire into whether the government considered delaying issuance of the license even longer than it did, but changed course because Del Monte filed suit.   Without such discovery, the government might be allowed to defeat jurisdiction based on a conclusory declaration, concerning facts exclusively within the government's control, that Del Monte has not had an adequate opportunity to rebut.

The evidentiary record also is incomplete, because there is no evidence before the Court addressing why the government did not issue the license – which it claims was already signed – for 1 1/2 days after the government received notice of this case, and after Del Monte filed and served its preliminary injunction motion, and after the Court scheduled a status conference on the motion.  See supra at 7.  On the face of it, the most reasonable inference to be drawn is that the filing of the lawsuit triggered issuance of the license, which otherwise could have been bottlenecked indefinitely.  But Del Monte has not had an opportunity to probe this issue, including how much longer it might have taken for OFAC to issue the license if the lawsuit had not been filed.  These plainly are facts relating to whether a voluntary cessation occurred for reasons related to the litigation.  The Court should not grant the motion without addressing voluntary cessation, and the Court should not rule on voluntary cessation without permitting Del Monte to take discovery relating to the chain of events that transpired within OFAC during that 1 1/2 day period.

### C.    Del Monte Has Standing to Bring This Suit

The Court should easily reject the government's specious argument that Del Monte lacks standing to bring this suit.  The essential flaw in the government's argument is that it seeks to evaluate standing – including redressability – at the present time instead of on the day Del Monte filed this action.  But that method of analysis conflicts with the law.  It is axiomatic that, "[a]s with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint."  Kitty Hawk AirCargo, Inc. v. Chao, 418 F.3d 453, 460

(5th Cir. 2005) (internal quotations and citations omitted); <u>see also</u> <u>Garden State</u>
<u>Broad. Ltd. P'ship v. FCC</u>, 996 F.2d 386, 394-95 (D.C. Cir. 1993) (standing is
determined when the lawsuit begins); <u>White v. Lee</u>, 227 F.3d 1214, 1243 (9th Cir.
2000) ("Standing is examined at 'the commencement of the litigation.'") (citing
<u>Friends of the Earth v. Laidlaw Envtl. Services, Inc.</u>, 528 U.S. 167 (2000)).

On the date this case was filed, the license had not been issued.  The
substantial economic injury that Del Monte faced from the absence of a license is
described in detail in its motion for preliminary injunction and associated
declarations.  <u>See</u> Mem. in Supp. of Pls.' Application for Prelim. Injunction at 27-30
(filed November 29, 2007).[6]  OFAC's failure to issue the license plainly threatened
Del Monte with imminent injury redressable by this Court, both through a
declaratory judgment and through other "necessary or proper" relief, such as an
injunction based on the declaratory judgment.  <u>See</u> 28 U.S.C. § 2202 (authorizing

---

[6]     The Court should consider those declarations for purposes of the motion to
dismiss even though the preliminary injunction motion has been withdrawn.  Del
Monte respectfully requests the Court to grant the motion to seal those declarations
filed November 29, 2007.

"[f]urther necessary or proper relief based on a declaratory judgment"); Amended

Complaint, Prayer for Relief (seeking declaratory judgment and such other relief as

is just and proper).[7]

The government is really asserting a <u>mootness</u> argument instead of a

standing argument by claiming, as it does, that Del Monte's injury is not

redressable at a point during the pendency of the case.  Mootness doctrine governs

redressability while the case is pending, and standing doctrine does not.  <u>Garden</u>

<u>State Broad. Ltd. P'ship</u>, 996 F.2d at 394-95 (when an injury cannot be redressed

due to actions after the filing of the lawsuit, the proper question is whether the suit

has become moot, not whether the plaintiff has standing); <u>see also</u> <u>Laidlaw</u>, 528

U.S. at 174 (distinguishing "initial standing" from "postcommencement mootness");

<u>United States Parole Comm'n v. Geraghty</u>, 445 U.S. 388, 397 (1980) (Mootness is

"the doctrine of standing set in a time frame:  The requisite personal interest that

---

[7]    We do not understand the government to be claiming that there was no
redressable injury on the day this suit was filed, simply because the license
allegedly was signed (yet held internally at OFAC) on that date.   Del Monte agrees
that a redressable injury existed on the date the case was filed, because the license
had not been issued to Del Monte, even if it had been signed earlier.  Of course, the
agency could have changed its mind and refused to issue the license, even if it had
been signed.

In addition, as a matter of administrative law, the license was not effective
until Del Monte received it.  The APA defines a license as an "order," and an "order"
has no operative effect unless it has been made publicly available or the affected
party has actual notice of it.  5 U.S.C. §§ 551(6), (9) (defining license as "order"); <u>id.</u>
§§ 552(a)(2)(i), (ii) (order may not be "relied on" or "used" without public availability
or actual notice).  OFAC does not publish its licenses, so the 2007 license only
became effective when Del Monte had actual notice of it.  Certainly the government
does not contend that Del Monte had a legal right to begin shipping to Iran before
OFAC advised the company that it had permission to do so.

must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (internal citation omitted)).

The government's assertion of a mootness argument under the incorrect rubic of standing brings us full circle. As explained in detail above, to determine whether a case is moot, the Court must look <u>beyond</u> present redressability and consider whether the controversy is "capable of repetition" or whether a "voluntary cessation" of challenged conduct has occurred. <u>See</u> <u>Houston</u>, 24 F.3d at 1429 (claim for declaratory judgment regarding the legality of a fully resolved "isolated agency action" is not moot if it fits within the "capable of repetition" or "voluntary cessation" exception). For the reasons set forth above, the parties' controversy is at a minimum "capable of repetition," and may well involve "voluntary cessation." Accordingly, the Court should reject the government's claim that an inability to redress injury during the pendency of the lawsuit justifies dismissal.

### D. The Court Should Reject the Government's Request to <u>Deny Del Monte a Remedy at the Pleadings Stage of the Case</u>

The Court also should reject the government's request to deny Del Monte a declaratory judgment remedy at the pleadings stage of the case. The crux of the government's argument is that dismissal is justified because the Court has not yet devoted resources to this case. But the only reason the Court has not yet devoted resources to this case is that it is at the pleadings stage. That fact provides absolutely no justification for dismissal. Although a declaratory judgment is a discretionary equitable remedy, the Court should only exercise its discretion at the merits stage of the case, after full briefing by the parties.

The cases cited by the government do not even come close to supporting its argument.  The Supreme Court did hold, in <u>Laidlaw</u>, 528 U.S. at 191-92 that a court might properly conclude that a case is <u>not</u> moot if the court has devoted substantial resources to it, because "[t]o abandon the case at an advanced stage may prove more wasteful than frugal."  But the Supreme Court did not hold that the converse is true – <u>i.e.</u>, that the <u>failure</u> of the Court to devote resources to a case justifies <u>dismissing</u> the action.  <u>Laidlaw</u> therefore lends no support to the government's request for a discretionary dismissal based on judicial resources.

The government also misapplies another Supreme Court case (<u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277 (1995)).  In <u>Wilton</u>, the Supreme Court held that the Fifth Circuit did not abuse its discretion in staying a federal court declaratory judgment action in deference to a parallel state court action that would dispose of the same issues.  The Court expressly declined to address the court's discretion in cases such as the present case, which "rais[e] issues of federal law" or have "no parallel state proceedings."  <u>Id.</u> at 290.

The government's request for a discretionary dismissal at the pleadings stage is so utterly baseless that it reveals a telling concern about how OFAC will fare on the merits of this case.  The Court should deny that request and proceed with the litigation.

## V.    <u>CONCLUSION</u>

The Court should deny the motion to dismiss.

Respectfully submitted,


_____/s/Daniel G. Jarcho_____
Daniel G. Jarcho (D.C. Bar No. 391837)
MCKENNA LONG & ALDRIDGE L.L.P.
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500
email: djarcho@mckennalong.com

Myron Paul Barlow (D.C. Bar No. 462886)
BARLOW AND ASSOCIATES, PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.  20015
(202) 895-1714
email: mb@barlowpllc.com

Attorneys for Plaintiffs
Del Monte Fresh Produce Company and
Del Monte Foods (U.A.E.) FZE

Dated:        February 8, 2008

# EXHIBIT 1

# OFFICE OF FOREIGN ASSETS CONTROL

### REPORT OF LICENSING ACTIVITIES

### PURSUANT TO

### THE TRADE SANCTIONS REFORM AND EXPORT ENHANCEMENT ACT OF 2000

### July - September 2006

## I.    Overview

This report is submitted pursuant to Section 906(b) of the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA") and covers activities undertaken by the Treasury Department's Office of Foreign Assets Control ("OFAC") under Section 906(a)(1) of the TSRA from July through September 2006.  Under the procedures established in its TSRA-related regulations, OFAC processes license applications requesting authorization to export agricultural commodities, medicine, and medical devices to Iran and Sudan under the one-year specific licensing regime set forth in Section 906 of the TSRA.

There was a 26.1 percent increase in the number of license applications received during this reporting quarter from the prior quarter (232 for Jul.-Sep. 2006, 184 for Apr.-Jun. 2006).  OFAC was able to issue licensing determinations[1] on 22.0 percent of all the license applications received during the July – September 2006 period (compared to 48.3 percent for the Apr.-Jun. 2006 period), and issued additional determinations after the quarter ended.  The average processing time for issuing licenses decreased by 7.3 percent to 44.7 business days in this quarter of operation, and the average time for issuing licensing determinations decreased by 7.0 percent to 41.2 business days versus 44.3 business days in the preceding quarter.

The increased complexity, volume, and length of license applications (the majority of applications pertain to the export of medical devices to Iran) coupled with the more protracted scrutiny on the part of other reviewing agencies continued to affect processing time of license applications in this quarter.  These cases are evaluated by other agencies both in terms of whether the foreign entities involved in the transaction "promote international terrorism," as required in section 906 of the TSRA, and in terms of whether the commodities at issue implicate independent export control regimes involving chemical or biological weapons or weapons of mass destruction as provided in section 904(2)(C) of the TSRA.

## II.    Program Operation

From July 1 to September 30, 2006, OFAC's Licensing Division received a total of 232 license applications pursuant to Section 906(a)(1) of the TSRA.  During this period, OFAC issued licensing determinations on 51 of the 232 license applications.  Fifty-five (55) licenses and six

---

[1] A licensing determination is defined as any action, either intermediate or final, that OFAC takes on a license application.  It may take the form of a license, a license amendment, a "return-without-action" letter, a general information letter, an interpretative letter, a denial letter, a telephone call, a fax, or an e-mail.

license amendments[2] were issued from July through September (*See Charts 1 and 2*).  On average, licenses and license amendments were issued within 44.7 business days of receipt of the application.  Upon completion, 90.2 percent (55 in total)[3] of the licenses and license amendments issued were sent via e-mail in Adobe Acrobat PDF format to licensees, a service that generated very favorable comment by licensees.  In addition, OFAC issued 27 "return-without-action" letters ("RWA letters") (average turnaround: 34.0 business days), and one denial letters (turnaround: 28.0 business days – also subject to interagency review) (*See Graph 1*).  The average number of business days for the Licensing Division to issue a licensing determination in response to submissions to OFAC on any license application under the TSRA regulations was 41.2 business days, a decrease of 7.0 percent compared with last quarter's average of 44.3 business days.  The total number of licenses/license amendments, RWA letters, and denial letters issued does not equal the number of license applications received because:  (1) not all license applications received during this quarter were closed in this quarter; (2) some license applications pending from prior quarters of operation were closed in this quarter; (3) in some instances multiple applications from the same license applicant were combined into one license; and (4) a few license applications were handled via telephone, fax, or e-mail.

As in past quarters, the preponderance of license applications submitted and licenses/license amendments issued was for Iran (*See Chart 3*).  A total of 210 license applications (90.5%) was received for Iran, in contrast to 21 (9.1%) for Sudan.  Likewise, 57 licenses/license amendments (93.4%) were issued for the sale of agricultural commodities, medicine, and medical devices to Iran, versus four (6.6%) for Sudan.  In keeping with the program's trend, half of the license applications (50.0%) and 39.3 percent of the licenses/license amendments were for the export of medical devices to Iran and Sudan.  Of the 210 license applications for Iran, 91 (43.3%) were for agricultural commodities, 14 (6.7%) for medicine, and 105 (50.0%) for medical devices.  Of the 57 licenses/license amendments issued for Iran, 29 (50.9%) were for agricultural commodities, four (7.0%) for medicine, and 24 (42.1%) for medical devices.  The percentage breakdown of the 21 license applications for Sudan is:  nine (42.9%) for agricultural commodities, two (9.5%) for medicine, and 10 (47.6%) for medical devices.  Of the four licenses/license amendments issued for Sudan, one (25.0%) was for agricultural commodities, three (75.0%) for medicine, and zero (0%) for medical devices.

## CHART 1
### Number of License Applications and Licenses Issued by Product

|  | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|---|---|---|---|---|
| License Applications | 100 | 16 | 116 | 232 |
| Licenses Issued | 27 | 5 | 23 | 55 |
| License Amendments Issued | 3 | 2 | 1 | 6 |
| Applications Denied | 0 | 0 | 1 | 1 |

---

[2] A "license amendment" is an amendment to an existing license previously issued by OFAC.  Some license amendment applications require interagency review, such as those adding an additional end-user or additional commodities to an existing license.

[3] Compared with 91.5 percent (130 in total) for Apr.-Jun. 2006.

### CHART 2
### Number of License Applications and Licenses Issued by Country

|                          | Iran | Sudan | TOTAL |
|--------------------------|------|-------|-------|
| License Applications[4]  | 210  | 21    | 232   |
| Licenses Issued          | 52   | 3     | 55    |
| License Amendments Issued| 5    | 1     | 6     |
| Applications Denied      | 1    | 0     | 1     |

### CHART 3
### Number of License Applications and Licenses Issued by Country and Product

|                                       | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|---------------------------------------|--------------------------|----------|-----------------|-------|
| **IRAN**                              |                          |          |                 |       |
| License Applications                  | 91                       | 14       | 105             | 210   |
| Licenses and License Amendments Issued| 29                       | 4        | 24              | 57    |
| **SUDAN**                             |                          |          |                 |       |
| License Applications                  | 9                        | 2        | 10              | 21    |
| Licenses and License Amendments Issued| 1                        | 3        | 0               | 4     |

### GRAPH 1

**Average Time for Issuing Licensing Determinations**
**(business days)**



---

[4] OFAC received one license application for Syria in this quarter of operation. On December 12, 2003, President Bush signed the Syria Accountability and Lebanese Sovereignty Restoration Act ("SAA") (Public Law 108-175). On May 11, 2004, President Bush issued Executive Order 13338 to implement §§ 5(a)(1), 5(a)(2)(A), and 5(a)(2)(D) of the SAA. Section 5(a)(1) of the SAA requires a prohibition on the export to Syria of all items on the Commerce Control List. Section 5(a)(2)(A) prohibits the export or reexport to Syria of all products of the United States, with the exception of food and medicine. The result of the implementation of §§ 5(a)(1) and 5(a)(2)(A) of the SAA is to restrict the export and reexport of all items subject to the Export Administration Regulations to Syria. The Department of Commerce's Bureau of Industry and Security is responsible for licensing exports and reexports, including food and medicine, to Syria.

Office of Foreign Assets Control                                         U.S. Department of the Treasury

# OFFICE OF FOREIGN ASSETS CONTROL

## REPORT OF LICENSING ACTIVITIES

### PURSUANT TO

## THE TRADE SANCTIONS REFORM AND EXPORT ENHANCEMENT ACT OF 2000

### October - December 2006

## I.    Overview

This report is submitted pursuant to Section 906(b) of the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA") and covers activities undertaken by the Treasury Department's Office of Foreign Assets Control ("OFAC") under Section 906(a)(1) of the TSRA from October through December 2006.  Under the procedures established in its TSRA-related regulations, OFAC processes license applications requesting authorization to export agricultural commodities, medicine, and medical devices to Iran and Sudan under the one-year specific licensing regime set forth in Section 906 of the TSRA.

There was a 20.3 percent decrease in the number of license applications received during this reporting quarter from the prior quarter (185 for Oct.-Dec. 2006, 232 for Jul.-Sep. 2006).  OFAC was able to issue licensing determinations[1] on 30.3 percent of all the license applications received during the October – December 2006 period (compared to 22.0 percent for the Jul.-Sep. 2006 period), and issued additional determinations after the quarter ended.  The average processing time for issuing licenses increased by 56.4 percent to 69.9 business days in this quarter of operation, and the average time for issuing licensing determinations increased by 55.3 percent to 64.0 business days versus 41.2 business days in the preceding quarter.

The increased complexity and length of license applications (the majority of applications pertain to the export of medical devices to Iran) coupled with the more protracted scrutiny on the part of other reviewing agencies continued to affect processing time of license applications in this quarter.  These cases are evaluated by other agencies both in terms of whether the foreign entities involved in the transaction "promote international terrorism," as required in section 906 of the TSRA, and in terms of whether the commodities at issue implicate independent export control regimes involving chemical or biological weapons or weapons of mass destruction as provided in section 904(2)(C) of the TSRA.

## II.    Program Operation

From October 1 to December 31, 2006, OFAC's Licensing Division received a total of 185 license applications pursuant to Section 906(a)(1) of the TSRA.  During this period, OFAC issued licensing determinations on 57 of the 185 license applications.  One hundred seventy-

---

[1] A licensing determination is defined as any action, either intermediate or final, that OFAC takes on a license application.  It may take the form of a license, a license amendment, a "return-without-action" letter, a general information letter, an interpretative letter, a denial letter, a telephone call, a fax, or an e-mail.

one (171) licenses and 14 license amendments[2] were issued from October through December (*See Charts 1 and 2*). On average, licenses and license amendments were issued within 69.9 business days of receipt of the application. Upon completion, 88.1 percent (163 in total)[3] of the licenses and license amendments issued were sent via e-mail in Adobe Acrobat PDF format to licensees, a service that generated very favorable comment by licensees. In addition, OFAC issued 26 "return-without-action" letters ("RWA letters") (average turnaround: 24.1 business days), and two denial letters (turnaround: 62.0 business days – also subject to interagency review) (*See Graph 1*). The average number of business days for the Licensing Division to issue a licensing determination in response to submissions to OFAC on any license application under the TSRA regulations was 64.0 business days, an increase of 55.3 percent compared with last quarter's average of 41.2 business days. The total number of licenses/license amendments, RWA letters, and denial letters issued does not equal the number of license applications received because: (1) not all license applications received during this quarter were closed in this quarter; (2) some license applications pending from prior quarters of operation were closed in this quarter; (3) in some instances multiple applications from the same license applicant were combined into one license; and (4) a few license applications were handled via telephone, fax, or e-mail.

As in past quarters, the preponderance of license applications submitted and licenses/license amendments issued was for Iran (*See Chart 3*). A total of 160 license applications (86.5%) was received for Iran, in contrast to 22 (11.9%) for Sudan. Likewise, 168 licenses/license amendments (90.8%) were issued for the sale of agricultural commodities, medicine, and medical devices to Iran, versus 22 (11.9%) for Sudan. In keeping with the program's trend, half of the license applications (50.3%) and 38.9 percent of the licenses/license amendments were for the export of medical devices to Iran and Sudan. Of the 160 license applications for Iran, 65 (40.6%) were for agricultural commodities, 20 (12.5%) for medicine, and 75 (46.9%) for medical devices. Of the 168 licenses/license amendments issued for Iran, 78 (46.4%) were for agricultural commodities, 25 (14.9%) for medicine, and 65 (38.7%) for medical devices. The percentage breakdown of the 22 license applications for Sudan is: four (18.2%) for agricultural commodities, two (9.1%) for medicine, and 16 (72.7%) for medical devices. Of the 17 licenses/license amendments issued for Sudan, seven (41.2%) were for agricultural commodities, three (17.6%) for medicine, and seven (41.2%) for medical devices.

## CHART 1
### Number of License Applications and Licenses Issued by Product

|  | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|---|---|---|---|---|
| License Applications | 70 | 22 | 93 | 185 |
| Licenses Issued | 72 | 27 | 72 | 171 |
| License Amendments Issued | 13 | 1 | 0 | 14 |
| Applications Denied | 0 | 0 | 2 | 2 |

---

[2] A "license amendment" is an amendment to an existing license previously issued by OFAC. Some license amendment applications require interagency review, such as those adding an additional end-user or additional commodities to an existing license.

[3] Compared with 90.2 percent (55 in total) for Jul.-Sep. 2006.

Office of Foreign Assets Control                                    U.S. Department of the Treasury

TSRA AgMed Program                                               Quarterly Report

## CHART 2
### Number of License Applications and Licenses Issued by Country

|  | Iran | Sudan | TOTAL |
|---|---|---|---|
| License Applications[4,5] | 160 | 22 | 185 |
| Licenses Issued | 154 | 17 | 171 |
| License Amendments Issued | 14 | 0 | 14 |
| Applications Denied | 2 | 0 | 2 |

## CHART 3
### Number of License Applications and Licenses Issued by Country and Product

|  | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|---|---|---|---|---|
| **IRAN** | | | | |
| License Applications | 65 | 20 | 75 | 160 |
| Licenses and License Amendments Issued | 78 | 25 | 65 | 168 |
| **SUDAN** | | | | |
| License Applications | 4 | 2 | 16 | 22 |
| Licenses and License Amendments Issued | 7 | 3 | 7 | 17 |

## GRAPH 1

### Average Time for Issuing Licensing Determinations
**(business days)**



---

[4] OFAC received one license application for Libya in this quarter of operation. Effective September 21, 2004, Executive Order 13357 terminated the emergency declared in Executive Order 12543 with respect to the policies and actions of the Government of Libya and revoked related Executive Orders. Accordingly, no OFAC license is required for exports to Libya. Executive Order 13357 does not, however, eliminate the need to comply with the licensing provisions of the Export Administration Regulations, 15 C.F.R. Parts 730 et seq.

[5] OFAC received two license applications for Syria in this quarter of operation. On December 12, 2003, President Bush signed the Syria Accountability and Lebanese Sovereignty Restoration Act ("SAA") (Public Law 108-175). On May 11, 2004, President Bush issued Executive Order 13338 to implement §§ 5(a)(1), 5(a)(2)(A), and 5(a)(2)(D) of the SAA. Section 5(a)(1) of the SAA requires a prohibition on the export to Syria of all items on the Commerce Control List. Section 5(a)(2)(A) prohibits the export or reexport to Syria of all products of the United States, with the exception of food and medicine. The result of the implementation of §§ 5(a)(1) and 5(a)(2)(A) of the SAA is to restrict the export and reexport of all items subject to the Export Administration Regulations to Syria. The Department of Commerce's Bureau of Industry and Security is responsible for licensing exports and reexports, including food and medicine, to Syria.

Office of Foreign Assets Control                                 U.S. Department of the Treasury

# OFFICE OF FOREIGN ASSETS CONTROL

## REPORT OF LICENSING ACTIVITIES

## PURSUANT TO

## THE TRADE SANCTIONS REFORM AND EXPORT ENHANCEMENT ACT OF 2000

### January - March 2007

## I.     Overview

This report is submitted pursuant to Section 906(b) of the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA") and covers activities undertaken by the Treasury Department's Office of Foreign Assets Control ("OFAC") under Section 906(a)(1) of the TSRA from January through March 2007.  Under the procedures established in its TSRA-related regulations, OFAC processes license applications requesting authorization to export agricultural commodities, medicine, and medical devices to Iran and Sudan under the one-year specific licensing regime set forth in Section 906 of the TSRA.

There was a 30.8 percent increase in the number of license applications received during this reporting quarter from the prior quarter (242 for Jan.-Mar. 2007, 185 for Oct.-Dec. 2006).  OFAC was able to issue licensing determinations[1] on 45.9 percent of all the license applications received during the January – March 2007 period (compared to 30.3 percent for the Oct.-Dec. 2006 period), and issued additional determinations after the quarter ended.  The average processing time for issuing licenses increased by 8.6 percent to 75.9 business days in this quarter of operation, and the average time for issuing licensing determinations increased by 15.6 percent to 74.0 business days versus 64.0 business days in the preceding quarter.

The increased complexity, volume, and length of license applications (the majority of applications pertain to the export of medical devices to Iran) coupled with the more protracted scrutiny on the part of other reviewing agencies continued to affect processing time of license applications in this quarter.  These cases are evaluated by other agencies both in terms of whether the foreign entities involved in the transaction "promote international terrorism," as required in section 906 of the TSRA, and in terms of whether the commodities at issue implicate independent export control regimes involving chemical or biological weapons or weapons of mass destruction as provided in section 904(2)(C) of the TSRA.

## II.     Program Operation

From January 1 to March 31, 2007, OFAC's Licensing Division received a total of 242 license applications pursuant to Section 906(a)(1) of the TSRA.  During this period, OFAC issued licensing determinations on 111 of the 242 license applications.  Two hundred fifteen (215)

---

[1]A licensing determination is defined as any action, either intermediate or final, that OFAC takes on a license application.  It may take the form of a license, a license amendment, a "return-without-action" letter, a general information letter, an interpretative letter, a denial letter, a telephone call, a fax, or an e-mail.

licenses and 12 license amendments[2] were issued from January through March (**See Charts 1 and 2**).  On average, licenses and license amendments were issued within 75.9 business days of receipt of the application.  Upon completion, 92.5 percent (210 in total)[3] of the licenses and license amendments issued were sent via e-mail in Adobe Acrobat PDF format to licensees, a service that generated very favorable comment by licensees.  In addition, OFAC issued six "return-without-action" letters ("RWA letters") (average turnaround:  23.3 business days), and two denial letters (turnaround:  25.0 business days – also subject to interagency review) (**See Graph 1**).  The average number of business days for the Licensing Division to issue a licensing determination in response to submissions to OFAC on any license application under the TSRA regulations was 74.0 business days, an increase of 15.6 percent compared with last quarter's average of 64.0 business days.  The total number of licenses/license amendments, RWA letters, and denial letters issued does not equal the number of license applications received because: (1) not all license applications received during this quarter were closed in this quarter; (2) some license applications pending from prior quarters of operation were closed in this quarter; (3) in some instances multiple applications from the same license applicant were combined into one license; and (4) a few license applications were handled via telephone, fax, or e-mail.

As in past quarters, the preponderance of license applications submitted and licenses/license amendments issued was for Iran (**See Chart 3**).  Two hundred three (203) license applications (83.9%) were received for Iran, in contrast to 36 (14.9%) for Sudan.  Likewise, 206 licenses/license amendments (90.7%) were issued for the sale of agricultural commodities, medicine, and medical devices to Iran, versus 21 (9.3%) for Sudan.  In keeping with the program's trend, nearly half of the license applications (45.9%) and 56.3 percent of the licenses/license amendments were for the export of medical devices to Iran and Sudan.  Of the 203 license applications for Iran, 74 (36.5%) were for agricultural commodities, 32 (15.8%) for medicine, and 97 (47.8%) for medical devices.  Of the 206 licenses/license amendments issued for Iran, 70 (34.0%) were for agricultural commodities, 18 (8.7%) for medicine, and 118 (57.3%) for medical devices.  Although fewer in number, the percentage breakdown of the 36 license applications for Sudan is analogous:  17 (47.2%) for agricultural commodities, six (16.7%) for medicine, and 13 (36.1%) for medical devices.  Of the 21 licenses/license amendments issued for Sudan, eight (38.1%) were for agricultural commodities, three (14.3%) for medicine, and 10 (47.6%) for medical devices.

### CHART 1
### Number of License Applications and Licenses Issued by Product

|                              | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|------------------------------|:---:|:---:|:---:|:---:|
| **License Applications**     | 93  | 38  | 111 | **242** |
| **Licenses Issued**          | 73  | 21  | 121 | **215** |
| **License Amendments Issued**| 5   | 0   | 7   | **12**  |
| **Applications Denied**      | 0   | 0   | 2   | **2**   |

---

[2] A "license amendment" is an amendment to an existing license previously issued by OFAC.  Some license amendment applications require interagency review, such as those adding an additional end-user or additional commodities to an existing license.

[3] Compared with 88.1 percent (163 in total) for Oct.-Dec. 2006.

## CHART 2
### Number of License Applications and Licenses Issued by Country

|                                | Iran | Sudan | TOTAL |
|--------------------------------|------|-------|-------|
| License Applications[4]        | 203  | 36    | 242   |
| Licenses Issued                | 194  | 21    | 215   |
| License Amendments Issued      | 12   | 0     | 12    |
| Applications Denied            | 2    | 0     | 2     |

## CHART 3
### Number of License Applications and Licenses Issued by Country and Product

|                                         | Agricultural Commodities | Medicine | Medical Devices | TOTAL |
|-----------------------------------------|--------------------------|----------|-----------------|-------|
| **IRAN**                                |                          |          |                 |       |
| License Applications                    | 74                       | 32       | 97              | 203   |
| Licenses and License Amendments Issued  | 70                       | 18       | 118             | 206   |
| **SUDAN**                               |                          |          |                 |       |
| License Applications                    | 17                       | 6        | 13              | 36    |
| Licenses and License Amendments Issued  | 8                        | 3        | 10              | 21    |

## GRAPH 1

**Average Time for Issuing Licensing Determinations**
(business days)



---

[4] OFAC received three license applications for Syria in this quarter of operation. On December 12, 2003, President Bush signed the Syria Accountability and Lebanese Sovereignty Restoration Act ("SAA") (Public Law 108-175). On May 11, 2004, President Bush issued Executive Order 13338 to implement §§ 5(a)(1), 5(a)(2)(A), and 5(a)(2)(D) of the SAA. Section 5(a)(1) of the SAA requires a prohibition on the export to Syria of all items on the Commerce Control List. Section 5(a)(2)(A) prohibits the export or reexport to Syria of all products of the United States, with the exception of food and medicine. The result of the implementation of §§ 5(a)(1) and 5(a)(2)(A) of the SAA is to restrict the export and reexport of all items subject to the Export Administration Regulations to Syria. The Department of Commerce's Bureau of Industry and Security is responsible for licensing exports and reexports, including food and medicine, to Syria.

Office of Foreign Assets Control                                        U.S. Department of the Treasury

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEL MONTE FRESH PRODUCE )
COMPANY and )
)
DEL MONTE FOODS (U.A.E.) FZE, )
)
       Plaintiffs, )      C.A. No. 1:07-cv-02143 (JDB)
)
    vs. )
)
UNITED STATES OF AMERICA, )
)
UNITED STATES DEPARTMENT OF )
THE TREASURY, and )
)
OFFICE OF FOREIGN ASSETS )
CONTROL, )
)
      Defendants. )

## DECLARATION OF JEFFREY S. BAILEY

I, Jeffrey S. Bailey, hereby declare as follows:

1.     I am the Associate General Counsel of Del Monte Fresh Produce
Company. In that capacity, I have responsibility for overseeing the legal aspects of
Del Monte Fresh Produce Company's applications to the Treasury Department's
Office of Foreign Assets Control ("OFAC") for export licenses under the Trade
Sanctions Reform and Export Enhancement Act of 2000. The facts set forth below
are based on my personal knowledge acquired during the course of my
responsibilities for oversight of these license applications.

2.     On October 20, 2006, I was involved in a telephone conference call with
Del Monte's outside counsel, Myron Paul Barlow, and an OFAC licensing official.

The subject of the call was the status of a license application that I had submitted to

OFAC almost three months earlier, on July 31, 2006, seeking approval to ship food

to customers in Iran. The licensing official could not say when the license would be

issued. The official further stated that the U.S. State Department had returned the

license application without any objection, that the license had been written, and

that the license only required a supervisor's signature for it to be issued. The

licensing officer then brought a supervisor into the conference call conversation.

The supervisor stated that he could not say when the license would be issued or

whether it would be issued at all. The supervisor also indicated that he had had the

licensing program running smoothly until a higher authority had intervened and

delayed the process. In particular, he stated that "Zeus" was interfering in his "hut"

and that as a result his licensing program was now like post-war "Dresden" and

"Czechoslovakia." He also stated that nothing was coming out of his "hut" until Del

Monte went to "Mount Olympus" to force OFAC to take action on the license.

3.     OFAC finally issued the license described above on November 8, 2006.

4.     Selling food products to Iran is, and has been, a part of the business

plan for Del Monte Fresh Produce Company and its foreign affiliates. As a result,

Del Monte Fresh Produce company will definitely apply for OFAC licenses in the

future, on a continuing basis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2008

Jeffrey S. Bailey

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEL MONTE FRESH PRODUCE                )
COMPANY and                            )
                                       )
DEL MONTE FOODS (U.A.E.) FZE,          )
                                       )
        Plaintiffs,                    )      C.A. No. 1:07-cv-02143 (JDB)
                                       )
    vs.                                )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
UNITED STATES DEPARTMENT OF            )
THE TREASURY, and                      )
                                       )
OFFICE OF FOREIGN ASSETS               )
CONTROL,                               )
                                       )
        Defendants.                    )

## DECLARATION OF MYRON PAUL BARLOW

I, Myron Paul Barlow, hereby declare as follows:

1.     I am a member at the law firm of Barlow and Associates, PLLC. I represent Del Monte Fresh Produce Company in connection with its licensing applications submitted to the Office of Foreign Assets Control ("OFAC"). Because of that representation, I have personal knowledge of the following facts.

2.     On October 20, 2006, I participated in a telephone conference call with Jeffrey Bailey, Associate General Counsel at Del Monte Fresh Produce Company, and two OFAC officials relating to a license application submitted on July 31, 2006. I have reviewed Mr. Bailey's February 7, 2008 Declaration, which discusses the conversation. That Declaration accurately describes the conversation.

3.    Del Monte Fresh Produce Company filed suit against OFAC later in October 2006 with respect to the license requested in the July 2006 application. That case was dismissed without prejudice in November 2006. After the case was dismissed, we contacted government counsel to request a meeting with OFAC officials in order to have a dialog about whether there was a way to accelerate the licensing process and avoid further harmful delays. The meeting never occurred.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2008

Myron Paul Barlow

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEL MONTE FRESH PRODUCE )
COMPANY and )
)
DEL MONTE FOODS (U.A.E.) FZE, )
)
     Plaintiffs, )    C.A. No. 1:07-cv-02143 (JDB)
)
vs. )
)
UNITED STATES OF AMERICA, )
)
UNITED STATES DEPARTMENT OF )
THE TREASURY, and )
)
OFFICE OF FOREIGN ASSETS )
CONTROL, )
)
     Defendants. )

### DECLARATION OF KATIA GOUSSET

I, Katia Gousset, hereby declare as follows:

1.    I am an international trade specialist at the firm of Barlow and

Associates, PLLC, which represents the Plaintiffs in this case. One of my job

responsibilities is to keep track of the status of license applications filed with the

Treasury Department's Office of Foreign Assets Control ("OFAC") by Del Monte

Fresh Produce Company. I have personal knowledge of the facts set forth below.

2.    On July 31, 2006, Del Monte Fresh Produce Company submitted a

license application to OFAC seeking authorization to ship food to customers in Iran.

OFAC acknowledged that it received the application on July 31, 2006. The

Company subsequently received a letter from OFAC indicating that OFAC had referred to the application to the State Department on August 7, 2006.

3.    On September 26, 2006, I spoke with an OFAC licensing officer who indicated that the State Department had returned the July 2006 application to OFAC two weeks before. I also contacted OFAC three other times during the September-October 2006 period. OFAC would not indicate in any of these conversations whether or when the license would definitely be issued. Del Monte Fresh Produce Company received this license on November 8, 2006.

4.    Del Monte Fresh Produce Company also submitted an application to OFAC on November 16, 2006 for an Iranian food export license. OFAC acknowledged that it received the application on November 17, 2006. OFAC provided me with information indicating that the State Department returned this application to OFAC on December 18, 2006. Del Monte Fresh Produce Company received this license on January 12, 2007.

5.    Del Monte Fresh Produce Company also submitted an application to OFAC on December 29, 2006 for an Iranian food export license. OFAC acknowledged that it received the application on January 3, 2007. OFAC provided me with information indicating that OFAC referred the application to the State Department on January 8, 2007. Del Monte Fresh Produce Company received this license on February 3, 2007.

6.    Del Monte Fresh Produce Company also submitted an application to OFAC on January 8, 2007 for an Iranian food export license. OFAC acknowledged

that it received the application on January 9, 2007. OFAC provided me with information indicating that OFAC referred the application to the State Department on January 11, 2007. Del Monte Fresh Produce Company received this license on February 14, 2007.

7.     Del Monte Fresh Produce Company also submitted an application to OFAC on February 6, 2007 for an Iranian food export license. OFAC acknowledged that it received the application on February 6, 2007. OFAC provided me with information indicating that OFAC referred the application to the State Department on February 9, 2007. Del Monte Fresh Produce Company received this license on March 20, 2007.

8.     On August 8, 2007, Del Monte Fresh Produce Company submitted another license application to OFAC seeking authorization to ship food to customers in Iran. OFAC acknowledged that it received the application on August 9, 2007. The August 2007 application was submitted under the same procedures applicable to the other licenses described above and was substantially the same as those earlier applications, with the only material differences being the particular food products at issue and the specific customers for which authorization was requested. OFAC assigned license application number IA-9771 to the license application submitted by Del Monte Fresh Produce Company on August 8, 2007.

9.     On September 4, 2007, I called the OFAC "help desk," which is a telephone line that the public can call to attempt to get information about the status of pending license applications. The OFAC "help desk" informed me that on August

3

17, 2007, OFAC sent application number IA-9771 to the State Department for review.

10.    On September 24, 2007, I called the OFAC "help desk," which informed me that the State Department responded to application number IA-9771 on September 13, 2007.

11.    On October 3, 2007, October 22, 2007, November 1, 2007, and November 27, 2007, I called the OFAC "help desk" to inquire about the status of application number IA-9771. On each occasion, the "help desk" indicated that the application was still pending but would give no indication of when the application was likely to be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2008

Katia Gousset

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEL MONTE FRESH PRODUCE COMPANY and | ) ) ) |
| DEL MONTE FOODS (U.A.E.) FZE, | ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| UNITED STATES DEPARTMENT OF THE TREASURY, and | ) ) ) |
| OFFICE OF FOREIGN ASSETS CONTROL, | ) ) ) |
| Defendants. | ) ) |

C.A. No. 1:07-cv-02143 (JDB)

## **PROPOSED ORDER**

Having reviewed Defendants' Motion to Dismiss for Lack of Subject Matter

Jurisdiction, Plaintiffs' Opposition and Defendants' Reply, the Court has

determined that it has subject matter jurisdiction over this action.   Defendants'

motion is HEREBY DENIED.

SO ORDERED.

_____

UNITED STATES DISTRICT COURT JUDGE

Copies to:


Daniel G. Jarcho
McKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, DC  20006

Myron Paul Barlow
BARLOW AND ASSOCIATES, PLLC
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C.  20015

Nicholas A. Oldman
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044